1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOSE VELASCO, | ) | 1:04-CV-06540 LJO SMS HC |
| | ) | |
| Petitioner, | ) | |
| | ) | FINDINGS AND RECOMMENDATION |
| v. | ) | REGARDING PETITION FOR WRIT OF |
| | ) | HABEAS CORPUS |
| | ) | |
| ROSANNE CAMPBELL, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Tulare, following his conviction by jury trial on August 23, 2001, of one count of second degree murder (Cal. Penal Code § 187). See Lodged Doc. No. 1.[1] The jury also found true the allegation that Petitioner had personally used a deadly weapon during the commission of the offense (Cal. Penal Code § 12022(b)(1)). Id. On January 8, 2002, Petitioner was sentenced to serve an indeterminate term of fifteen years to life plus one year. Id.

---

[1]"Lodged Doc." refers to the documents lodged by Respondent with his response.

1    Petitioner filed a notice of appeal to the California Court of Appeals, Fifth Appellate District

2  (hereinafter "Fifth DCA"). On June 4, 2003, the Fifth DCA affirmed the judgment in an unpublished

3  opinion. See Lodged Doc. No. 5. On July 17, 2003, Petitioner filed a petition for review in the

4  California Supreme Court. See Lodged Doc. No. 6. The petition was denied on August 20, 2003. See

5  Lodged Doc. No. 7.

6    On November 14, 2004, Petitioner filed the instant petition in this Court. The petition

7  presented the following four grounds for relief: (1) "Petitioner's motion for new trial should have

8  been granted on the basis of ineffective assistance of counsel"; (2) "Ineffective assistance of counsel

9  not raised in Petitioner's motion for new trial prejudiced Petitioner"; (3) "Prosecutorial misconduct

10  denied Petitioner a fair trial"; and (4) "Cumulative error denied Petitioner a fair trial and resulted in a

11  miscarriage of justice."

12    On January 31, 2005, Respondent filed a motion to dismiss the petition as a mixed petition

13  containing unexhausted claims. Petitioner filed an opposition to Respondent's motion to dismiss on

14  February 22, 2005. On April 27, 2005, the District Court granted Respondent's motion to dismiss

15  and Petitioner's motion to withdraw the unexhausted claim and hold the petition in abeyance. The

16  petition was then stayed until June 4, 2006, when the Court vacated the stay following Petitioner's

17  report that exhaustion had been completed. Petitioner filed a first amended petition on June 8, 2006,

18  in compliance with the Court's order.

19    On October 25, 2006, Respondent filed an answer to the amended petition. Petitioner filed

20  his traverse on May 22, 2007.

21                          **FACTUAL BACKGROUND**[2]

22    There was little dispute about what occurred on the day Petitioner killed Joey Pacheco.

23  Petitioner and his sister went to the house in which Pacheco's girlfriend lived to serve her with

24  documents related to an eviction. Pacheco and Petitioner argued. The argument quickly escalated

25  into a fistfight, perhaps instigated by Pacheco. The fistfight escalated into a fight with weapons;

26  Pacheco grabbed a tire iron and Petitioner a baseball bat.

27  ───────────────

28    [2]The facts are derived from the factual summary set forth by the Fifth DCA in its opinion of June 4, 2003, and are presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). See Lodged Doc. No. 5.

Petitioner claimed at trial that he acted in self-defense. One factual dispute was who grabbed a weapon first. Petitioner contended he retrieved an aluminum baseball bat to protect himself after Pacheco grabbed the tire iron. Witnesses testified that Petitioner pulled out the bat first and Pacheco tried to protect himself with the tire iron.

Pacheco retreated to his vehicle when Petitioner picked up the bat. Petitioner began striking the vehicle near the driver's door. Pacheco and his girlfriend got out of the vehicle on the passenger's side. Pacheco threw the tire iron, striking Petitioner on the arm and causing a wound requiring five stitches. The testimony differed as to whether this occurred before Petitioner retrieved the bat or after Petitioner began striking Pacheco's car.

When Pacheco exited the vehicle, he was on the opposite side of the vehicle from Petitioner. Petitioner went around the vehicle and hit the unarmed Pacheco with the bat at least two times and possibly as many as four. At least one of the blows, and perhaps two, landed on Pacheco's head, crushing his skull, and ultimately killing him.

Petitioner returned to his vehicle and left. He was arrested later that night when he went to a hospital seeking treatment for the wound on his arm. Petitioner checked into the hospital using an assumed name.

Petitioner gave three recorded statements to the police that were essentially consistent with the above facts. Petitioner stated that he disposed of the bat while leaving the scene of the incident. The police recovered a bat believed to be the murder weapon from a boat located at his sister's house.

The information charged Petitioner with one count of murder in the first degree and charged a single weapon enhancement. The prosecution argued that Petitioner went to the house that day looking for trouble, and the killing was first degree because Petitioner retrieved the bat with the intent to kill Pacheco. The prosecutor also claimed that Petitioner acted with premeditation when he circled the vehicle and attacked the unarmed Pacheco.

Petitioner argued at trial that he acted in self defense but, even if the jury determined it was not self-defense, then he acted in the heat of passion and was guilty of, at most, voluntary manslaughter.

**DISCUSSION**

**I.  Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 2241(d).  Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* <u>Drinkard v. Johnson</u>, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

**II.  Legal Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996.  <u>Lockyer v. Andrade</u>,  538 U.S. 63, 70 (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); <u>see</u> <u>Lockyer</u>, 538 U.S. at 70-71; <u>see</u> <u>Williams</u>, 529 U.S. at 413.

1    As a threshold matter, this Court must "first decide what constitutes 'clearly established

2 Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

3 quoting 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court

4 must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

5 of the relevant state-court decision." Id., quoting Williams, 592 U.S. at 412. "In other words, 'clearly

6 established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by

7 the Supreme Court at the time the state court renders its decision." Id.

8    Finally, this Court must consider whether the state court's decision was "contrary to, or

9 involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,

10 quoting 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the

11 writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

12 question of law or if the state court decides a case differently than [the] Court has on a set of

13 materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

14 "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state

15 court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

16 applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

17    "[A] federal court may not issue the writ simply because the court concludes in its

18 independent judgment that the relevant state court decision applied clearly established federal law

19 erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A

20 federal habeas court making the "unreasonable application" inquiry should ask whether the state

21 court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.

22    Petitioner has the burden of establishing that the decision of the state court is contrary to or

23 involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle,

24 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

25 Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

26 decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th

27 Cir.1999).

28    AEDPA requires that we give considerable deference to state court decisions. The state

court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's interpretation of its own laws. <u>Souch v. Schaivo</u>, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

**III.  Review of Petitioner's Claims**

**A. Ground One**

Petitioner first argues he received ineffective assistance of counsel. He presents seven instances where he claims counsel performed deficiently: 1) By failing to offer Petitioner's initial statement to police in which he expressed his fear that the victim would obtain a gun; 2) By eliciting an opinion from Detective Lopez that Petitioner had lied to him; 3) By failing to object to inadmissible statements in Petitioner's taped statements; 4) By failing to request an in limine hearing on the issue of Petitioner's waiver of his <u>Miranda</u> rights; 5) By failing to determined whether the bat that was recovered was the actual weapon used by Petitioner; 6) In failing to protect a key defense witness from being impeached with her criminal history; and 7) By alluding to counsel's own troubles with the District Attorney's Office and the prosecutor himself.

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  <u>Canales v. Roe</u>, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984); <u>Lowry v. Lewis</u>, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. <u>Strickland</u>, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. <u>Id</u>. at 688; <u>United States v. Quintero-Barraza</u>, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  <u>Strickland</u>, 466 U.S. at 687; <u>Sanders v. Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir.1994).

1    Second, the petitioner must demonstrate that "there is a reasonable probability that, but for

2    counsel's unprofessional errors, the result ... would have been different." Strickland, 466 U.S. at 694.

3    Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial,

4    one whose result is reliable. Id. at 688.  The court must evaluate whether the entire trial was

5    fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78

6    F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

7    A court need not determine whether counsel's performance was deficient before examining

8    the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S. at

9    697.  Since the defendant must affirmatively prove prejudice, any deficiency that does not result in

10   prejudice must necessarily fail. However, there are certain instances which are legally presumed to

11   result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of

12   counsel or where the State has interfered with counsel's assistance. Strickland, 466 U.S. at 692;

13   United States v. Cronic, 466 U.S. 648, 659, and n. 25 (1984).  Ineffective assistance of counsel

14   claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362

15   (2000).  Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

16       *1.  Failure to Offer Petitioner's Initial Statement to Police*

17   Petitioner first claims counsel erred by failing to introduce Petitioner's initial statement to

18   police. Petitioner had made three separate statements to authorities. On April 27, 2001, Petitioner

19   provided a statement in the emergency room at Kaweah Delta District Hospital while he awaiting

20   treatment for his injuries. (CT[3] 227.) On April 28, 2001, Petitioner gave a statement at the Visalia

21   Police Department after he had been arrested. (SCT[4] 1-16.) Petitioner gave a third statement on the

22   same date, also at the police station. (SCT 17-32.) The prosecutor offered the latter two statements

23   into evidence at trial; however, neither party introduced the first.

24   During his initial statement, Detective Lopez asked Petitioner: "When you got to the van and

25   were grabbing the bat, what was [the victim] doing and where was he?" (CT 241.) Petitioner

26

27        [3]"CT" refers to the Clerk's Transcript on Appeal.

28        [4]"SCT" refers to the Supplemental Clerk's Transcript on Appeal.

responded as follows:

> He was walking - he was walking back to his car, like he was gonna get something out, so I don't know *I thought he was probably gonna get a gun* or something you know. I don't know what he got, but he - he was walking back to his truck and - and I went around you know I was all - uh - well uh - you know so what's up - you know what are you gonna do? And he - and he hit me - you know - I - (inaudible) hit me, I thought he was trying to scare me - I had the bat right here - you know - if (inaudible) him I would have raised it up and you know - tried to hit him, but he - you know he - he knocked me - he lunged at me - you know and - and I - he wasn't hitting my face, but I just went like that - you know and I had got the bat and I swung at him like that - you know - I swung - I swung it across and I hit him - you know then that - that knocked him back to his truck - you know then - then I thought he was gonna hit me with it, but he threw it at me and that's when like it went - went over my shoulder right here and - and I just him again and - and he went down.

(CT 241, emphasis added.)

There was no evidence presented at trial that Petitioner feared the victim was going to retrieve a firearm; however, trial counsel argued during his closing that Petitioner went after the victim because of a possible firearm. Defense counsel argued as follows:

> If I am at a street corner and somebody came at me, and I am in my car with a baseball bat, I would just step on it. ¶ Well, he didn't do anything like that. Which further convinces him that he might be looking for a gun . . . . ¶ Certainly [the victim], as close as the vehicles were, could have easily gotten the gun out of there and gone over, and he was vulnerable as hell, and shot him in the head and shot his sister for that matter. . . . ¶ And he didn't know, given the wild behavior of [the victim], what he was going to do when he went in there. And he tried to get into the vehicle and throttle this guy because he was utterly vulnerable *when he said to Lopez in that interview, "I thought he might be going to get a gun or something."*

(RT[5] 352-353, emphasis added.)

The prosecutor responded in his rebuttal:

> Defense counsel said that you will find that in these transcripts here, take them back and look, that the defendant said he was worried that [the victim] was going to get a gun. Did he say that a few minutes ago? Read them. You will never see it because it's not there. It's not there. It's just not there. Like his defense, it's not there.

(RT 361.)

After a bench discussion was held, the trial court informed the jury: "All right. Ladies and gentlemen, there is nothing mentioned about a gun in the statements that were admitted into evidence. And the evidence is closed in this matter. All right." (RT 362.)

Petitioner faults defense counsel for failing to introduce the evidence in the first place. He claims that because of counsel's failure, he was deprived of a meritorious defense. If the statement

---

[5]"RT" refers to the Reporter's Transcript on Appeal.

had been introduced, he claims he could have demonstrated justifiable homicide or imperfect self-defense.

This claim was first presented on direct appeal to the Fifth DCA. On June 4, 2003, the Fifth DCA denied the claim in a reasoned opinion. See Lodged Doc. No. 5. On July 17, 2003, Petitioner filed a petition for review in the California Supreme Court. See Lodged Doc. No. 6. The petition was summarily denied on August 20, 2003. See Lodged Doc. No. 7. The California Supreme Court, by its "silent order" denying review of the Fifth DCA's decision, is presumed to have denied the claims presented for the same reasons stated in the opinion of the Fifth DCA. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In rejecting this claim, the Fifth DCA found trial counsel did not err in failing to introduce the statement, because it was inadmissible as a hearsay statement. Petitioner argued it was admissible under the state of mind hearsay exception pursuant to Cal. Evid. Code § 1250. Nevertheless, the Fifth DCA determined the statement was not trustworthy pursuant to Cal. Evid. Code § 1252; therefore, it could not be introduced under the state of mind exception. The appellate court specifically noted:

> [Petitioner] knew that he had caused substantial injury. [He] then fled the scene and, by his own admission, disposed of the baseball bat. He admitted his family suggested he flee the state. He checked into the hospital using an assumed name to avoid capture. ¶ Each of these facts demonstrates [Petitioner] knew he was facing arrest. The statement at the hospital was made under circumstances of suspicion when [Petitioner] had a motive to fabricate. Therefore, the statements were not admissible pursuant to the state of mind exception to the hearsay rule.

See Lodged Doc. No. 5 at 7.

In addition, the appellate court found that even if counsel's actions fell below that of a reasonable attorney, Petitioner had failed to demonstrate prejudice. Even if the gun testimony had been admitted, the claim of self-defense remained highly suspect. Petitioner stated he believed the victim returned to his vehicle to retrieve a gun. Petitioner stated he then went to his own vehicle to retrieve a baseball bat. However, it was undisputed that the victim did not emerge from his vehicle with a gun. The victim had picked up a tire iron which he threw at Petitioner, and Petitioner responded by hitting the victim's vehicle with the bat. The victim then emerged from the vehicle's other side without a weapon of any kind. Petitioner then walked around the vehicle and attacked him

1   with the bat. As found by the appellate court, if Petitioner had any fear that the victim possessed a

2   gun, he would not have pursued him around the vehicle. Moreover, if this was truly Petitioner's fear,

3   he would surely have mentioned it more than one isolated instance at the hospital.

4        As correctly argued by Respondent, the state court's factual findings are presumed correct

5   under 28 U.S.C. § 2254(e)(1), and the appellate court's determination that Petitioner's statement was

6   inadmissible is entitled to deference under the AEDPA. Lambert v. Blodgett, 393 F.3d 943, 972 (9th

7   Cir.2004). Therefore, counsel cannot be faulted for his failure to seek admission of the statement.

8        Nevertheless, even if the statement had been admitted, Petitioner did not suffer prejudice

9   because his claim of self-defense would have remained unbelievable despite the statement. There

10  was no evidence of a gun, and Petitioner himself stated he never saw a gun. (CT 237.) Moreover,

11  Petitioner's act of pursuing the victim around the vehicle while wielding a bat was completely

12  inconsistent with fear of a gun.

13       In addition, as noted by the appellate court, if Petitioner had truly feared the victim possessed

14  a firearm, one would have expected him to state so in all of his statements to police. Rather, when

15  questioned regarding his state of mind, he simply stated he feared being struck with the tire iron.

16  (SCT 7-8, 9-10, 26, 28-29.)

17       Therefore, Petitioner has failed to demonstrate that counsel erred or that Petitioner suffered

18  any prejudice as a result of the alleged error. The claim should be rejected.

19       *2. Eliciting Testimony from Detective Lopez that Petitioner Lied*

20       Petitioner next claims defense counsel provided ineffective assistance when he elicited an

21  opinion from Detective Lopez in which he stated he believed Petitioner lied during the interview.

22       Like his first claim above, this claim was first presented on direct appeal and denied in a

23  reasoned opinion. It was then raised in a petition for review to the California Supreme Court where it

24  was summarily denied. The California Supreme Court is presumed to have denied the claims

25  presented for the same reasons stated by the Fifth DCA. Ylst, 501 U.S. at 803.

26       The record shows that during defense counsel's cross-examination of Detective Lopez, he

27  asked the following:

28       [Defense counsel]: Now, [Petitioner] didn't lie to you, did he?

1    [Detective Lopez]: The defendant?

2    [Defense counsel]: Yeah.

3    [Detective Lopez]: I think he did.

4  (RT 65.)

5         Petitioner contends there was no reasonable strategy for counsel to make such inquiry. He

6  argues he was prejudiced because such a determination was for the jury to make. Respondent argues

7  these questions were taken out of context, and when viewing the entire discussion, it is clear trial

8  counsel's strategy was to force the detective to acknowledge that Petitioner was in fact truthful.

9  Respondent's argument is persuasive. After counsel asked the questions above, he followed with

10  several additional questions, as follows:

11    [Defense counsel]: Well, let me ask you this: He told you he went over to serve eviction
         papers, right?
12
     [Detective]: Yes.
13
     [Defense counsel]: That's not a lie, is it?
14
     [Detective]: I don't think so.
15
     [Defense counsel]: He told you he went with his sister, didn't he?
16
     [Detective]: Yes.
17
     [Defense counsel]: That's not a lie?
18
     [Detective]: No.
19
     [Defense counsel]: He told you that he got into a fist fight with [the victim], didn't he?
20
     [Detective]: Yes.
21
     [Defense counsel]: That wasn't a lie?
22
     [Detective]: No.
23
24  (RT 65-66.)

25         In addition, as pointed out by Respondent, the trial court advised the jury that the "officer's

26  opinion as to who is lying and who isn't [is] irrelevant. The jury is going to make up their mind

     [about] who is lying." (RT 76.)
27
         Therefore, it is clear that the strategic purpose behind counsel's line of questioning was to
28

show Petitioner was in fact truthful in his rendition. And, the excerpt above shows he was at least partially successful. Accordingly, Petitioner has failed to demonstrate that counsel's questioning of Detective Lopez was not sound trial strategy. Strickland, 466 U.S. at 689.

And as found by the appellate court, Petitioner cannot demonstrate prejudice. The trial court advised the jury that the detective's opinion of Petitioner was irrelevant and instructed the jury that they were solely responsible for determining the believability of the witnesses. Petitioner has not shown counsel erred or that he suffered prejudice. This claim should also be denied.

### 3. Failure to Object to Inadmissible Statements

Petitioner next argues counsel failed to object to certain portions of recorded statements played to the jury which improperly referenced his criminal background. During the third statement Petitioner gave to police, the following discussion took place:

[Detective Lopez]: . . . And then all this stuff about hiding and running, remember I was wondering if there was some other reason why you would want to run?

[Petitioner]: Yeah.

[Detective Lopez]: Is this the reason?

[Petitioner]: No, that's not the reason. I mean - I mean probably the truth - I mean - I - I could probably you know - I could probably win the case - I mean he had a weapon as well. I mean he took out his weapon - you know - we had - we both had weapons - we both wanted to fight. You know maybe (inaudible) more serious than me. (Inaudible)

[Detective Lopez]: *So you know a lot about this kinda stuff?*

[Petitioner]: Yeah.

[Detective Lopez]: And you learned that from your other friend that was involved in this kinda (inaudible)

[Petitioner]: No, I mean I - I learned that - I mean through *all the times being in the system* - you know.

[Detective Lopez]: Okay.

[Petitioner]: It wasn't like I jumped him or I - I - I - I went over there - you know to start problems - you know I - I went over there you know - so my sister could serve the papers.

[Detective Lopez]: Okay. Well perhaps that might be the thing for us at this point because your - *your pattern with him of problems that you've had before*. It almost looks as if either you set this up or you planned on it and I can't tell which one and all the things that followed they're a little bit odd.

(SCT 28-29, emphasis added.)

1    Petitioner complains that these references improperly suggested that he had a propensity to commit

2    acts of violence.

3         As with the above claims, this claim was presented and denied on direct appeal, and then

4    raised in a petition for review to the California Supreme Court where it was summarily denied. The

5    California Supreme Court is presumed to have denied the claims presented for the same reasons

6    stated by the Fifth DCA. Ylst, 501 U.S. at 803.

7         In rejecting this claim, the Fifth DCA concluded there was no prejudice. The court stated:

8              . . . [W]e do not see how this one sentence in 30 pages of transcript could possibly
               lead to a conclusion that it is reasonably probable that but for that statement he would have
9              received a more favorable result.

10             The most incriminating fact in this case was not [Petitioner's] vague involvement
               with the system, but that he crushed an unarmed man's skull with a baseball bat. Other
11             incriminating factors included that he struck [the victim] more than once, fled the scene,
               considered leaving the state, and attempted to obtain medical treatment under an assumed
12             name. This single reference is so insignificant that it [] cannot have caused [Petitioner] any
               prejudice. Without prejudice, there is no ineffective assistance of counsel.

13

14   See Lodged Doc. No. 5 at 17.

15        The state court rejection of Petitioner's claim was not an unreasonable application of

16   Strickland. Petitioner's statement regarding the "system" was so vague and innocuous, it could not

     have prejudiced Petitioner. There was no reference to violence, nor was there any reference to prior
17
     convictions or charges. There is no likelihood whatsoever that the jury could have convicted
18
     Petitioner as a result of these statements. This claim should be rejected as well.
19
          *4.  Waiver of Miranda Rights*
20
          In his next claim for relief, Petitioner alleges trial counsel was ineffective in failing to move
21
     to suppress his post-arrest statements on the basis of a violation of his Miranda rights. See Miranda
22
     v. Arizona, 384 U.S. 436 (1966). Petitioner contends the first interview, in which Petitioner was not
23
     read his Miranda warnings, "softened [him] up." See Petition at 22. He claims he did not explicitly
24
     waive his Miranda rights in the subsequent interviews, which were conducted early in the morning.
25
     He argues that had counsel moved to suppress these interviews, the court would have ruled them
26
     inadmissible, and therefore, the outcome of the trial would have been different.
27
          This claim was also raised and rejected by the appellate court on direct appeal, and then
28

raised and rejected by the California Supreme Court without comment. The appellate court rejected the claim by noting first that the initial interview was never admitted into evidence; therefore, there was no need to advise Petitioner of his <u>Miranda</u> warnings with respect to this interview.

As to the second and third interviews, the appellate court analyzed the validity of his <u>Miranda</u> waiver and found no violation. First, the court determined Petitioner acted voluntarily. The court compared the facts of Petitioner's case with numerous court decisions where circumstances compelled a finding of impermissible "softening up" and determined no such circumstances existed in Petitioner's case. The appellate court stated:

> When the detective approached [Petitioner] in the hospital, the only question was whether a crime had been committed. There is no evidence of police coercion, intimidation or deception. Instead, it appears that [Petitioner] was a willing participant in the conversation and was anxious to tell his side of the story.

<u>See</u> Lodged Doc. No. 5 at 13.

Second, the court found the waiver to be effective. Petitioner was read the mandated advisement and stated he understood those rights. He never affirmatively waived those rights, however. He alleges this failure to acquire an express waiver by the investigators required suppression of his statements. Nevertheless, the appellate court, referring to U.S. Supreme Court and California Supreme Court cases, noted that lack of an express waiver of rights does not render a statement inadmissible. The court found that under the circumstances, where Petitioner was read his rights, stated he understood them, and never indicated he wanted an attorney or did not want to answer questions, constituted an effective waiver. Since the waiver was determined to be voluntary and effective, the court determined trial counsel could not be faulted for failing to file a frivolous motion.

The state court rejection of this claim was not unreasonable. As noted by Respondent, the first statement was never offered into evidence. Therefore, Petitioner's claim of a <u>Miranda</u> violation as to this first statement was meritless.  With respect to the second and third statements, Petitioner's waiver was knowing and voluntary. The mere fact that Petitioner did not expressly waive his rights does not render his waiver unknowing or involuntary. Respondent correctly notes that an express waiver is not necessary. <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979) ("An express written or

1   oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof

2   of the validity of that waiver, but is not inevitably either necessary or sufficient to establish

3   waiver."). Rather, "a defendant's silence, coupled with an understanding of his rights and a course of

4   conduct indicating waiver," may support a conclusion that a defendant has waived his rights. Id. A

5   review of the record reveals Petitioner's implied waiver was knowing and voluntary. Petitioner

6   stated he understood his rights after they were read to him. The detectives did not coerce or

7   intimidate him. He was not tricked into admitting guilt. Rather, the record reveals Petitioner eagerly

8   spoke to the detectives about the offense in an effort to convince them he acted in self-defense.

9   Despite being questioned several times, he never once expressed unwillingness to answer their

10   questions, nor did he request an attorney.

11        There is also no merit to Petitioner's claim that he was "softened up" in the first interview.

12   Respondent correctly notes the Supreme Court has held that a confession obtained through

13   psychological coercion can violate due process. The test for determining if Petitioner's statements

14   were obtained in a manner that offends due process is whether his "will has been overborne and his

15   capacity for self-determination critically impaired." Schneckloth v. Bustamonte, 412 U.S. 218, 225

16   (1973). In making this determination, the Court must assess the totality of the circumstances. Id. at

17   226. In this case, both the details of the interrogation and the characteristics of the accused lead to a

18   finding that Petitioner's statements were completely voluntary and not the subject of psychological

19   coercion. Petitioner has not shown he was particularly vulnerable, either due to his intelligence or his

20   age. He was not detained for a substantial amount of time. He was not subjected to physical

21   punishment such as the deprivation of sleep or food. He did not have to endure repeated and

22   prolonged questioning. The record shows Petitioner eagerly and willingly spoke to the detectives. He

23   stated he understood his Miranda warnings. He never sought to end or halt questioning. At no time

24   did he request an attorney. Rather, he spoke to the detectives and attempted to persuade them that he

25   reacted in self-defense. Therefore, it cannot be said that the state court unreasonably rejected his

26   claim.

27        In Missouri v. Seibert, 542 U.S. 600 (2004), the Supreme Court held that Miranda warnings

28   given in the middle of an interrogation, after Petitioner had already given an unwarned confession,

were ineffective, and therefore, the post-warning statements could not be used at trial. Nevertheless, Seibert is inapplicable. Here, Petitioner was not initially subjected to custodial interrogation. When detectives contacted him in the hospital, he was not arrested or restrained. Therefore, he was not in custody and Miranda warnings were not required. United States v. Rodriguez-Preciado, 399 F.3d 1119, 1129 (9th Cir.2005). As further pointed out by Respondent, Seibert is a plurality opinion and is therefore not clearly established for purposes of the AEDPA. Jacobsen v. United States Postal Service, 993 F.2d 649, 655 (9th Cir.1992). And third, Seibert was not clearly established at the time of Petitioner's conviction; therefore, the state courts were not bound by it. Jackson v. Giurbino, 364 F.3d 1002, 1005 (9th Cir. 2004).

Even if Seibert applied, there was no violation of Petitioner's due process rights. The detectives did not employ a two-step process here. The police initially contacted Petitioner about the incident and he immediately confessed his involvement. Moreover, he eagerly gave his rendition of the events in an effort to demonstrate he acted in self-defense. When police later arrested him and took his statement at the police station, it was clear from the record that events had taken a new turn. Seibert, 542 U.S. at 622 (Kennedy, J., concurring) ("[A] substantial break in time and circumstances between the prewarning statement and the Miranda warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn.")  Petitioner was read his Miranda warnings and he stated he understood them. Again, he willingly spoke to officers about his involvement. There is no evidence that detectives pressured Petitioner in any manner. Under the totality of the circumstances, the state court reasonably determined Petitioner's statements were voluntary. For these reasons, the claim should be denied.

### *5.  Failure to Investigate the Recovered Bat*

Petitioner next claims counsel was ineffective in failing to conduct investigation regarding the actual bat recovered by police. Petitioner had told police that he had thrown the bat from his vehicle when he fled the scene. However, the bat admitted into evidence at trial was recovered from a boat during a search of Petitioner's sister's house. (RT 80-81.) The bat bore red paint smears that the police suspected came from the victim's red truck and would have been consistent with Petitioner's statements that he had struck the victim's truck with the bat. (RT 82, 91.) The bat also

bore what appeared to be blood stains. (RT 89-91.) The initial crime report determined the paint smears were consistent with the victim's vehicle. (RT 91.) However, shortly after trial, a subsequent lab report revealed that the red paint smears on the bat were inconsistent with the paint on the victim's vehicle. Petitioner now argues the bat was "probably not the real murder weapon." <u>See</u> Petition at 24. He claims that by introducing the bat recovered at his sister's house, the prosecutor was able to destroy his credibility by claiming Petitioner lied when he stated he discarded the bat by throwing it from his vehicle.

This claim was also raised and rejected on direct appeal to the Fifth DCA. It was then raised and summarily denied in a petition for review to the California Supreme Court. In denying the claim, the appellate court first noted that defense counsel had no reason to believe the bat was not the actual murder weapon. The initial crime lab found the paint smears to be consistent, and there was no evidence that Petitioner ever informed counsel the bat was not the actual murder weapon. Indeed in the instant petition, Petitioner does not allege the bat recovered was not the actual murder weapon. He merely states that the bat was "*probably* not the real murder weapon." <u>See</u> Petition at 24, emphasis added. Given the totality of the circumstances, defense counsel could not be faulted for failing to independently test the bat.

Moreover, Petitioner cannot demonstrate prejudice. It was undisputed that Petitioner had struck the victim with a bat and killed him. Thus, there was no need to recover the actual bat. As to Petitioner's claim the prosecutor was able to destroy his credibility by pointing out Petitioner's lie, the Fifth DCA noted the attack on Petitioner's credibility "was cumulative with [Petitioner's] fleeing from the scene, disposing of the bat, consideration of fleeing the jurisdiction, and using an assumed name to obtain medical treatment." <u>See</u> Lodged Doc. No. 5 at 20. In addition, the attack on Petitioner's credibility was less damaging considering the material facts of the case. "[Petitioner admitted that [the victim] threw the tire iron at him *before he attacked* the victim, i.e., [Petitioner] admitted [the victim] was unarmed when he began swinging at [the victim's] head with a deadly weapon. He swung so hard that he *crushed* [the victim's] skull." <u>Id</u>.

Again, Petitioner has failed to demonstrate counsel erred or that the alleged error resulted in prejudice. The state court's rejection of this claim was not unreasonable.

1     *6.  Failure to Protect Key Witness from Impeachment*

2          In his next claim of ineffective assistance of counsel, Petitioner alleges trial counsel failed to

3     protect a key defense witness from impeachment with her criminal history. He argues counsel should

4     have requested a hearing outside the presence of the jury to determine the admissibility of the

5     witness's prior convictions before agreeing to stipulate that the witness suffered misdemeanor

6     convictions for those crimes.

7          The record shows that Arlene James was to be called by the defense as an eyewitness to the

8     events. Prior to trial, the prosecutor indicated he would be attempting to impeach her credibility by

9     questioning her regarding two misdemeanor convictions for misrepresenting herself to a police

10    officer and vandalism, and one felony conviction for petty theft with a prior. (RT 13.) He also noted

11    James had two misdemeanor narcotics convictions, but he did not intend to refer to those crimes as

12    they did not involve moral turpitude. (RT 13.) The trial court stated it would allow this

13    impeachment. (RT 13-14.)

14         Arlene James then testified at trial and provided a version of events consistent with

15    Petitioner's. During cross-examination, the prosecutor asked James the following: "Okay. And by

16    the way, ma'am, did you - - you have a felony conviction for theft, isn't that correct?" (RT 219.)

17    James responded, "For drugs, possession." (RT 219.) The prosecutor followed up by asking her,

18    "You don't have a felony possession or felony conviction for petty theft with a prior?" (RT 219.)

19    James responded, "No. Not that I am aware of. I have a conviction for that but I don't think it was a

20    felony. I think it was dropped down." (RT 219.)

21         On re-direct, defense counsel attempted to rehabilitate James by eliciting testimony that she

22    had been working with children for the past five years, and aside from a few brushes with the law in

23    the past, she had been a productive person. (RT 220-221.) Defense counsel then offered to stipulate

24    that James had sustained a misdemeanor conviction for petty theft and for drug possession "so [the

25    prosecutor] doesn't have to dig them up." (RT 222.) The court then instructed the jury: "Ladies and

26    gentlemen, I want you to disregard all this testimony about this woman's prior criminal involvement.

27    None of the matters that have been mentioned here are proper evidence going to her truthfulness."

28    (RT 222.)

As with his previous claims, this claim was raised and rejected by the appellate court and then the California Supreme Court. The appellate court first noted that the prosecutor had no intention of bringing up the drug possession charge, and trial counsel had no indication that the charge would be discussed. See Lodged Doc. No. 5 at 22. Second, as the record demonstrates, the prosecutor did not bring up the drug possession charge; James did when she provided a nonresponsive answer to the prosecutor's question about the petty theft conviction. Id. Trial counsel then acted as a reasonable attorney would and made the stipulation to avoid any additional inquiry into the witness's criminal background thereby limiting further damage to her credibility. The appellate court determined counsel's actions were entirely proper. In addition, it found no prejudice since the trial court directed the jury to eliminate the line of questioning when considering the witness's credibility.

Petitioner has failed to show that the state court unreasonably applied Strickland in rejecting his claim. Therefore, the claim should be rejected.

### 7. Defense Counsel's Allusions to His Own Troubles

In his final claim of ineffective assistance, Petitioner argues defense counsel erred by referring to his previous battles with the prosecutor in the presence of the jury. Petitioner argues that defense counsel's arguments against the prosecutor "detracted from the presentation of the defense case," and "added to the appearance that defense counsel was acting as an unprofessional advocate more interested in trying to salvage his own reputation [than] in presenting his client's defense." See Petition at 28.

Petitioner points to three instances which he claims were particularly damaging. In the first instance, trial counsel was questioning his investigator. In attempting to explain his investigator's testimony to the trial court, the following exchange took place:

> [Defense Counsel]: I think he is saying that he never typed it up, he just wrote some notes concerning this. I mean it's real difficult for my investigator right now because as a result of the troubles that I had with the DA's office and the State Bar I am closing up my business in November, and we have moved it all to my house.
>
> [Prosecutor]: That sounds like a play for sympathy, and it's not appropriate.

(RT 266.)

1    Later in the questioning, this exchange took place:

2    [Defense Counsel]: Okay. And you were being paid 400 a week and Sylvia gets paid 400 a
     week?
3
     [Investigator]: Yes, sir.
4
     [Defense Counsel]: And we moved the office to my office?
5
     [Investigator]: Yes, sir.
6
     [Defense Counsel]: And it's not real organized?
7
     [Investigator]: Not organized.
8
     [Defense Counsel]: We got seven puppies running around, two kids, and we are trying our
9    best to get everything done before I am suspended by the State Bar?

10   [Investigator]: Yes, sir.

11   (RT 288.)

12       And in closing arguments, the following colloquy ensued:

13   [Defense Counsel]: Now, I had one other trial with this man which you heard a little bit about
     today and I just before sitting down I want to tell you something to be wary of.
14
     [Prosecutor]: Your Honor.
15
     THE COURT: What's that?
16
     [Prosecutor]: Counsel is talking about something that's completely irrelevant at this time.
17
     [Defense Counsel]: Can I finish and then you can -
18
     THE COURT: Yes.
19
     [Prosecutor]: He is talking about another trial he has had with me. There has actually been
20   several, and he wants to talk about a specific trial. And if he wants to talk about those facts,
     I'll talk about those facts, but it's not evidence in this case.
21
     [Defense Counsel]: I don't want to talk about those facts. I just want to tell you what he does
22   so you'll be wary of it when he delivers his summation. It's a technique which lots of people
     in the DA's office use, and that's basically to distort my argument to tell you something
23   really lame that I said which I didn't say at all. . . .

24          But the fact of the matter is I hope you understand the points that I have tried to make
     here. And if he gets up there and says listen how stupid [Defense Counsel] was talking, you
25   remember this is something these guys do. Government employees or not, everybody has got
     personal ambition, career ambition. I have run head on into it.
26
     (RT 358-59.)
27
         As with his other claims, this claim was presented and rejected by the Fifth DCA on direct
28

1   appeal and by the California Supreme Court. The appellate court rejected the claim as follows:

2            [Petitioner] does not cite any authority to support his proposition that these exchanges
         deprived him of the effective assistance of counsel. His argument appears to be that the jury
3        must have viewed him in a bad light because of his attorney's actions.

4            There is no support in the record for this proposition. Some of the exchanges
         appeared to be directed towards helping or rehabilitating the defense's investigator. It is true
5        that trial counsel should not have intimated that he was about to have his license to practice
         suspended, nor should he have made a vague reference to the former prosecution. But these
6        relatively innocuous comments were part of a hotly contested trial. Other exchanges between
         the attorneys established the existence of animosity that could have existed for a variety of
7        reasons. It is unlikely that these particular comments had any effect on the jury.

8            It is not enough for [Petitioner] to show that the alleged errors had a conceivable
         effect on the outcome; he must show that they actually had an adverse effect. (*Strickland v.*
9        *Washington, supra,* 466 U.S. at p. 693.) Here, [Petitioner] does nothing but speculate, and
         asks us to do the same. It is just as likely that trial counsel's actions evoked some sympathy
10       for the jury, resulting in a second degree murder conviction, as it is likely that the jury was
         aggravated by trial counsel's conduct. More importantly, trial counsel's actions, while in
11       some cases unprofessional, could have been the result of a tactical decision to attempt to
         evoke sympathy for [Petitioner] and portray the prosecutor as overzealous. In any event, the
12       record does not support this claim.

13  See Lodged Doc. No. 5 at 25-26.

14       Petitioner's claim is without merit. He fails to cite any authority for his argument that

15  counsel's references to his own legal and financial troubles constitutes ineffective assistance. While

16  some of counsel's comments were inappropriate, they could have been based on a tactical decision

17  by counsel to evoke sympathy for his client, to rehabilitate his investigator, and to portray the

18  prosecutor as overzealous. The Court indulges a strong presumption that counsel's conduct falls

19  within the wide range of reasonable professional assistance.  Strickland, 466 U.S. at 687; Sanders, 21

20  F.3d at 1456. In any event, his actions did not constitute error so serious that he was not functioning

21  as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687.  The claim should

22  be denied.

23       **B.  Ground Two**

24       Petitioner next claims the prosecutor committed misconduct by arguing there was no

25  evidence that Petitioner feared the victim possessed a gun, and by withholding potentially

26  exculpatory evidence in the form of the forensic evidence report of the baseball bat.

27       A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so

28  infected the trial with unfairness as to make the resulting conviction a denial of due process."

1    Darden v. Wainwright, 477 U.S. 168, 171 (1986), *quoting* Donnelly v. DeChristoforo, 416 U.S. 637,

2    643 (1974); Bonin v. Calderon, 59 F.3d 815, 843 (9th Cir. 1995).  To constitute a due process

3    violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of

4    the defendant's right to a fair trial."  Greer v. Miller, 485 U.S. 756, 765 (1987), *quoting* United

5    States v. Bagley, 473 U.S. 667 (1985). Under this standard, a petitioner must show that there is a

6    reasonable probability that the error complained of affected the outcome of the trial, i.e., that absent

7    the alleged impropriety, the verdict probably would have been different.

8         As previously discussed, Petitioner intimated at one point during his initial interview with

9    detectives that he feared the victim might have a gun. During closing remarks, defense counsel

10   argued to the jury that Petitioner began hitting the victim's truck because he believed the victim

11   might have a gun. (RT 350- 357.) However, the first interview had not been admitted; therefore,

12   there was no evidence in the record that Petitioner believed there was a gun. It was apparent that

13   defense counsel mistakenly believed the first statement had been admitted.

14        The prosecutor made the following remark during his rebuttal:

15   Defense counsel said that you will find that in these transcripts here, take them back and
     look, that the defendant said he was worried that [the victim] was going to get a gun. Did
16   [defense counsel] say that a few minutes ago? Read them. You will never see it because it's
     not there. It's not there. It's just not there. Like his defense, it's not there.
17
     (RT 361.)
18
19        Trial counsel immediately objected and a bench discussion took place. Defense counsel told

20   the prosecutor, "I don't know why you hid this from the jury, [Prosecutor]." (RT 361.) After another

21   bench discussion, the trial court instructed the jury as follows: "All right. Ladies and gentlemen,

22   there is nothing mentioned about a gun in the statements that were admitted into evidence. And the

23   evidence is closed in this matter." (RT 362.)

24        The prosecutor then resumed his rebuttal, commenting:

25   The defendant did give two lengthy statements to the detective. And not once in either one of
     these statements does he mention a fear about a gun. And you can say, oh, the prosecutor is
26   hiding something. It's not evidence. And we play by rules in this game, and that's what it's
     called unfortunately by a lot of people, a game. And it's not. But there are rules. And we are
27   subject to them.

28   (RT 362.)

1    This claim was also raised and rejected on direct appeal and in the petition for review in the

2    state courts. The appellate court found no misconduct occurred because the prosecutor was merely

3    reacting to trial counsel's misrepresentation of the evidence. See Lodged Doc. No. 5 at 29. As the

4    jury was required to decide the case based on the evidence admitted at trial, his remarks were

5    appropriate.

6    The state court rejection of this claim was reasonable. The prosecutor did not take unfair

7    advantage of the defendant by asking the court to exclude the statement and then using it's absence

8    against him. Rather, defense counsel made an argument to the jury that was not based on the

9    evidence admitted. The prosecutor properly brought to the jury's attention the fact that there was no

10   such evidence admitted. As the prosecutor's remarks did not so infect the trial with unfairness as to

11   make the resulting conviction a denial of due process, the claim should be rejected. Donnelly, 416

12   U.S. at 643.

13   Petitioner also claims the prosecutor committed misconduct by withholding the evidence in

14   the form of the second forensic lab report regarding the bat.  A prosecutor's suppression of evidence

15   favorable to the accused violates due process when the evidence is material to guilt or to punishment.

16   Brady v. Maryland, 373 U.S. 83, 87 (1963).  Evidence is material "only if there is a reasonable

17   probability that, had the evidence been disclosed to the defense, the result of the proceeding would

18   have been different."  United States v. Bagley, 473 U.S. 667, 682 (1985).  "[A] constitutional error

19   occurs, and the conviction must be reversed, only if the evidence is material in the sense that its

20   suppression undermines confidence in the outcome of the trial."  Id. at 678.

21   The Fifth DCA analyzed this claim and rejected it, finding first that the report never

22   established that the bat was not in fact the murder weapon. See Lodged Doc. No. 5 at 30. The

23   forensic report only dealt with the paint on the bat; it never addressed the dried blood that was also

24   on the bat. Id. It was entirely possible, as Petitioner concedes, that it was the actual murder weapon.

25   Petitioner's failure to object to its admission at trial is telling in this regard. Moreover, the appellate

26   court noted that the forensic report, even if it was concealed, was not material evidence sufficient to

27   undermine confidence in the outcome of the trial. As previously discussed, it was undisputed that

28   Petitioner used a bat to crush the victim's skull and kill him. Admitting the actual bat into evidence

1    could not have had a significant effect on the verdict. Therefore, the state court did not unreasonably

2    apply Bagley, and the claim should be denied.

3        **C.  Ground Three**

4        In his final claim for relief, Petitioner alleges the cumulative effect of the errors alleged

5    resulted in an unfair trial and hence a miscarriage of justice.

6        A defendant may prove that he has suffered prejudice based on the cumulative effect of

7    errors. Kyles v. Whitley, 514 U.S. 419, 421-22, 440-41 (1995) (in determining whether exculpatory

8    evidence suppressed by state is sufficiently material to violate Due Process Clause, court is required

9    to assess "cumulative" or "net" effect of all suppressed evidence and commits legal error if it only

10   conducts piecemeal analysis of each item of suppressed evidence); O'Neal v. McAninch, 513 U.S.

11   432, 435-36 (1995) (accepting lower court's assumption that "confusion arising out of a trial court

12   instruction about the state of mind necessary for conviction combined with a related statement by a

13   prosecutor" required habeas corpus relief if "combined" error was not harmless); Fuller v. Roe, 182

14   F.3d 699, 704 (9th Cir.1999) ("cumulative effect of several errors may prejudice a defendant to the

15   extent that his conviction must be overturned"); Cooper v. Fitzharris, 586 F.2d 1325, 1333 (9th

16   Cir.1978) (concluding cumulative effect of alleged errors may demonstrate prejudice), *cert. denied*,

17   440 U.S. 974 (1979).

18       In this case, however, none of the claims raised by Petitioner have merit.  Accordingly,

19   Petitioner cannot demonstrate prejudice resulting from the cumulative effect of the errors, because

20   there are no errors affecting the verdict to accumulate. See Villafuerte v. Stewart, 111 F.3d 616, 632,

21   (9th Cir.1997) (*per curiam*). The claim should be rejected.

22       **RECOMMENDATION**

23       Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

24   DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

25   Respondent.

26       This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill,

27   United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule

28   72-304 of the Local Rules of Practice for the United States District Court, Eastern District of

California.  Within thirty (30) days (plus three days if served by mail) after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   April 3, 2008**                         **/s/ Sandra M. Snyder**
                                        UNITED STATES MAGISTRATE JUDGE